Andrew Perry **CLARK** et al., Appellants,

v.

James Green Lawson **COULSON**, Appellee.

No. 10885.

Court of Civil Appeals of Texas.

Austin.

Oct. 25, 1961.

Rehearing Denied Nov. 15, 1961.

540

W. S. Leslie, Edd B. Keyes, San Angelo, for appellants.

Hardeman, Smith & Foy, Smith & Crawford, Sedberry & Williams, San Angelo, for appellee.

HUGHES, Justice.

This suit is brought to establish, affirm the validity and declare the effect of an

alleged contract between appellee, James Green Lawson Coulson, and his deceased and only brother, Charles Louis Coulson.

The nature of the alleged contract, dated in the Fall of 1919, was that appellee, who at the time resided in Alabama, would dispose of his Alabama property, move to San Angelo, Texas, and there help his brother in the operation of a business in which he was then engaged, in consideration of which appellee or appellee and his wife Ollie, would presently receive one half of all property owned by C. L. Coulson, and at his death, if appellee survived, appellee would receive all property then owned by C. L. Coulson.

C. L. Coulson died in 1956. He was never married. He left a will, duly probated, in which Andrew Perry Clark and his two minor sons, Charles Andrew Clark and Louis Grayson Clark, appellants, were principal beneficiaries.

The remaining parties were Kate Crenshaw, Ethel Tester, Dora Tester and Jeff Crenshaw, the only surviving children of Sallie Coulson Crenshaw, deceased, the only sister of appellee and C. L. Coulson.

These parties, called impleaded defendants, adopted the pleadings of appellee.

Before trial, Luther Lynn, Guardian of the Estate of James Green Lawson Coulson, was substituted as plaintiff.

Trial to a jury resulted in a verdict favorable to appellee.[1] Upon this verdict judgment was rendered, in part, reading:

"that the aforesaid contract found by the jury to have been entered into between the said James Green Lawson Coulson, and the said Charles Louis Coulson, is in all things valid and effective to vest in the said James Green Lawson Coulson the full title to all the estate of the said Charles Louis Coulson, as such estate existed at the time of the death of the said Charles Louis Coulson, subject only to all lawful debts, taxes, and claims against said estate, and all lawful expenses of administration thereof in said Probate Cause No. 4885; and the said James Green Lawson Coulson is DECLARED, ADJUDGED and DECREED to be the owner of all of the said estate and of all properties there-

[1]. The jury verdict follows:
"From a preponderance of the evidence do you find that during or about the month of October 1919 C. L. Coulson (otherwise known as Charles Louis Coulson) wrote a letter to his brother James Green Lawson Coulson (otherwise known as James Coulson), signed by the said C. L. Coulson, and stating in substance that if the said James Coulson would sell out his own business in Alabama and move to San Angelo, Texas, and go into business there with the said C. L. Coulson, he, the said C. L. Coulson, would at his death leave all his estate to his said brother, the said James Coulson (or to the said James Coulson, and wife, Ollie Coulson)? Answer Yes or No. Answer: Yes.
"From a preponderance of the evidence do you find that the said James Coulson received the letter, if any, inquired about in the foregoing Special Issue No. 1? Answer Yes or No. Answer: Yes.
"From a preponderance of the evidence

do you find that within a reasonable time thereafter (that is, after the receipt of such letter, if any) the said James Coulson wrote to the said C. L. Coulson a letter accepting such offer, if any? Answer Yes or No. Answer: Yes.
"From a preponderance of the evidence do you find that after the receipt by the said James Coulson of the said letter, if any, from the said C. L. Coulson, he, the said James Coulson sold out his own business in Alabama and moved to San Angelo, Texas, to go in business there with the said C. L. Coulson? Answer Yes or No. Answer: Yes.
"From a preponderance of the evidence do you find that the said James Coulson did the things inquired about in Special Issue No. 4 in reliance upon the promise, if any, of the said C. L. Coulson contained in said letter, if any, to will his property at his death to James Coulson (or the said James Coulson and wife, Ollie Coulson)? Answer Yes or No. Answer: Yes."

of, real, personal, or mixed, it being further DECLARED, ADJUDGED and DECREED in this connection, that the said instrument dated February 15, 1950, and duly probated as aforesaid, as the Last Will and Testament of the said Charles Louis Coulson, deceased, is wholly ineffective to revoke or abrogate the aforesaid contract between the said James Green Lawson Coulson, and the said Charles Louis Coulson, or to in anywise affect the rights of the said James Green Lawson Coulson under such contract."

Appellants' first two points read:

"Point No. 1: There being insufficient evidence of probative value to support the contract sued on, the court erred in submitting this cause to the jury, and in failing to find for appellants as a matter of law.

"Point No. 2: The competent evidence of probative value was insufficient to sustain the finding of the jury that the contract sued on was entered into, and it was error to refuse to enter judgment for appellants."

These points are "no evidence" points rather than points that the verdict of the jury is so against the great weight and preponderance of the evidence as to be clearly wrong.

■ In disposing of "no evidence" points "it is proper to consider only that evidence most favorable to the issue and to disregard entirely that which is opposed to it or contradictory in its nature." Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W. 2d 609, 613.

■ We will set out the principal evidence upon which appellee relies to support the jury verdict.

The Coulson brothers were youths together in Alabama. When Mr. C. L. Coulson was a young man (early 1900's) he moved to San Angelo, Texas, where he entered into a wholesale candy business. His brother, the appellee, remained in Alabama until the Fall of 1919 when he, too, and his wife Ollie moved to San Angelo. It is the circumstances surrounding this move that give rise to this lawsuit. It is appellee's contention that this move was made pursuant to a valid contract between him and his brother, C. L. Coulson. The contract is said to consist of a letter from C. L. Coulson to appellee and his wife, written about October, 1919, constituting an offer and acts of acceptance by appellee in compliance with the offer.

The letter, after diligent search where it might be expected to be found, was not located or offered in evidence. The principal witness to its existence and content was T. M. Holloway.

Mr. Holloway, 56, was the brother of Ollie, the deceased wife of appellee. He testified by deposition taken in April, 1959. He expressed a willingness to appear and testify personally at the trial, but he died before trial. Mr. Holloway had known appellee and his father, H. H. Coulson, since he was a child. He first met C. L. Coulson about 1920. Mr. Holloway's mother was Mary Samantha Holloway. Prior to the time appellee and his wife Ollie moved to San Angelo from Alabama, Mrs. Mary Samantha Holloway lived with them. She did not accompany them to San Angelo. In the Spring or early Summer of 1920, Mrs. Holloway visited her daughter, Mrs. Lottie Allen in Elmdale, Kansas. At the time of this visit the witness Holloway was working near Elmdale, Kansas and lived with his sister.

We now quote the testimony of Mr. Holloway:

"Q. During the time of the visit of your mother, Mrs. Mary Samantha Holloway with her daughter, Mrs. Lottie Izetta Allen in April 1920, I will ask you whether or not during that time your mother ever showed you a letter written by Charles Louis Coulson

to his brother, James Green Lawson Coulson? A. Yes, my mother showed me a letter written by Charles Coulson to his brother, James Coulson.

"Q. If you have stated that your mother did show you a letter inquired about in the preceding question, then please state the reason or occasion for showing you that letter? A. My mother had this particular letter and showed it to me.

"Q. Will you please state below your answers to the following subdivisions of this question with reference to that letter from Charles Louis Coulson to his brother James Green Lawson Coulson:

"(1) State whether or not said letter was dated and if so the date of said letter. A. I do not recall the exact date of the letter, except that it came to James and Ollie in the fall of 1919.

"(2) State whether or not said letter was enclosed in an envelope and if so where was said envelope postmarked? A. Yes, it was in an envelope postmarked San Angelo, Texas.

"(3) Please give the name or names and address contained on said envelope? A. As I recall it the letter was addressed to Mr. and Mrs. James Coulson, Sylvania, Alabama, with notation in the upper corner on the left side: from Charles Coulson, San Angelo, Texas.

"(4) State whether or not there was a return address on said envelope and if so from whom? A. Yes, Charles Coulson, San Angelo, Texas.

"(5) Please state who signed the letter. A. The letter was signed in the handwriting of Charlie Coulson, which said handwriting was known to me at that time.

"(6) Please state to whom the letter was addressed? A. Mr. and Mrs. James Coulson.

"(7) Please state and give the substance of said letter? A. I cannot give the substance of the letter verbatim, but it was to the effect that Charlie requested Jim and Ollie to move to San Angelo to live, and he stated he would give Jim half of his business he had at that time, and half of what personal property he had at that time and that at his death Jim and Ollie would receive the entire proceeds from his estate, whatever same happened to be at the time of his death.

"(8) State whether or not you have read the contents of the aforesaid letter? A. Yes, I read it.

"(9) If you have answered that you read the contents of said letter, please state why you remember the contents of said letter? A. There were several things to cause me to remember about this letter. The first proposition is, I thought it was a kind proposition for my sister and her husband, Jim.

"(10) Please state in whose handwriting said letter was written? A. It was in the handwriting of Charles Coulson, who is also known as Charlie Coulson.

"(11) Please state in whose handwriting the address and return address was in on the envelope? A. Charles Coulson.

\*      \*      \*      \*      \*      \*

"(15) Since the occasion of your mother showing you the envelope and letter from Charles Louis Coulson to James Green Lawson Coulson, have you seen said letter and envelope? A. Yes, I have seen the letter several times since my mother first showed it to me; in fact, it was with her possessions and from the date I first saw it I continued to see it until approximately 1940, but I have not seen it since approximately that time.

"(16) Please state whether or not you have searched for said letter and

envelope written by Charles Louis Coulson to his brother, James Green Lawson Coulson? A. I have searched for the letter through all the papers in my home.

\* \* \* \* \* \*

"(18) Do you know the reason why, if any, your mother had the aforesaid letter and envelope in her possession? A. I do not know.

"(19) Please state if prior to that time, that is, in April 1920, you were acquainted with the handwriting of Charles Louis Coulson? A. Yes.

"(20) Please state prior to April 1920 the occasions, if any, you had had to observe the handwriting of Charles Louis Coulson? A. I had seen many letters written by Charles Louis Coulson to my sister and her husband and to other members of our family.

"(21) Please state after April 1920 whether or not you had any occasions to observe the handwriting of C. L. Coulson? A. Yes.

"(22) If you have answered the preceding question that you had occasion to observe the handwriting of C. L. Coulson, then state when and upon what occasions? A. I was in his place of business on visits to my sister and her husband and I saw his handwriting there on sales slips and other articles connected with his business."

Mr. Holloway visited in San Angelo for a week in August 1920. Regarding this visit he testified:

"Q. Please state whether or not when you came to San Angelo, Texas, prior to the time of death of your sister, Ollie Sophronia Lee Coulson, whether or not you had occasion to talk and be with Charles Louis Coulson? A. Yes, I was with him on several occasions during my visit there. My brother-in-law and he were living in the house together.

"Q. If you have answered the preceding question yes, then please state what and when such occasions were that you talked with Charles Louis Coulson with reference to his writing to his brother, James Green Lawson Coulson about coming to San Angelo? A. I talked with him every day I was in Texas during the last illness and death of my sister.

"Q. Please state the occasion or occasions and give the substance of any conversation you had with Charles Louis Coulson and what he said with reference to anything about him writing to his brother, James Green Lawson Coulson, about coming to San Angelo, Texas? A. We discussed the letter which he had previously written to my sister and brother-in-law and he confirmed that fact by stating it was his intention of leaving them what he had at the time of his death, and that he had also prior to that date fulfilled the other part of his agreement by giving his brother and sister-in-law, Mr. and Mrs. Jim Coulson, one half interest in all the property he owned. He took me around and showed me the business, and I was with him around his business and talked with him on several occasions about the difference in conditions in Texas where he lived, and back on Sand Mountain where we were reared.

"Q. On such occasions prior to the death of your sister, Ollie Sophronia Lee Coulson, please state in detail as near as you recall what you said and what Charles Louis Coulson said about the said Charles Louis Coulson writing to James Green Lawson Coulson about coming to San Angelo, Texas? A. I recall Mr. Charles Coulson's asking me if I knew the facts and conditions under which Jim Coulson and his wife came to Texas. I told him I did due to the fact I had seen the letter he had written and his generous offer to Mr. and Mrs. Jim Coulson coming out there.

He then stated to me he had given Jim and Ollie half of everything he owned at the time they came there and that at his death they were to get full and complete title and possession to the other half interest in his property."

Testimony strongly confirming Mr. Holloway was given by the witnesses Roy Tester, Jr., J. E. Young, Clarence Wilson and Vernon Rutherford. This testimony was of conversations with C. L. Coulson in which Mr. Coulson made corroborating statements. We quote only from the testimony of Mr. J. E. Young. The importance and weight of his testimony is attested by the fact that he had been elected and served as City Commissioner of the City of San Angelo longer than any other person had ever served.

Mr. J. E. Young and C. L. Coulson were close friends. He testified to a conversation with Mr. Coulson in 1928:

"Q. Now, Mr. Young, on that occasion I will ask you whether or not there was any statements made and if so what, by Mr. Charles Louis Coulson, with reference to his brother James and his business affairs, as to whether he had them in order? A. Well, I have known before—yes, he was talking; he told me it had been necessary, he'd of have to have gone out of business, but he wrote his brother along in 1919 to come out and take charge of his business. I asked him, I says, 'Well, what connection, not able to continue your business?' He says, 'Well, I went into a contract will with my brother to get him out here to come and take charge of my business, and I split the profit fifty-fifty, and the business would be,' and half interest in his business and what he had; and that he also had in the will that he had, that in case he passed away first that he left it all to his brother, because he had been a life saver to him in the business, come taking charge of it, and felt he should have it because he was

responsible for it and wanted him, if he passed away first he wanted his business to go to him."

In 1926, C. L. Coulson wrote in his own handwriting a will from which we quote the following:

"* * * I have one Brother 3 neises and one Neffew. It is my desire and will that at my Death my Brother James Green Lawson Coulson shall take charge of all of my Business and have full Power to Collect all my income and to use same as he wishes, all of my Realestate to be his as long as he lives and all of my Personal Property, except I want him to Give to my Neise Catty Crenshaw $500.00 My Nece Dora Tester $500.00 My Nece Ethel Tester $500.00 and my Neffew Jeff Crenshaw $500.00 This to be Paid in Cash within 12 months after my Death. All of the remainder of my Estate to remain to my Brother. * * * But it is my wish that he give to the Cause of Jesus Christ our Lord through the Baptest Church at least 10% of the net income of all my Estate. This instrument of writting is not in regular Form but it is intended to convay all my Estate to my Brother without Bond or cost, except the $2000.00 to be divided equally between my 3 neices and 1 Neffew."

This will was superseded by other wills.

We will not attempt to construe this will, but the jury could reasonably consider it to be substantially consistent with the alleged contract and as corroborating its existence.

Under the rule previously stated for disposition of these points, it is our opinion that the evidence sufficiently supports the findings of the jury.

Appellants cite Dyess v. Rowe, 177 S.W. 1001, 1003, writ ref. (1915), San Antonio Civil Appeals, where in a suit of like character the Court stated that:

"It is a delicate matter to allow a contract of the character of the one

under consideration to prevail, for the dead man cannot tell about the affair, and the testimony obtained is usually in favor of the living, for the latter are usually the prime favorites as against those whose tongues are closed in death. Such being the condition of affairs when such a contract is made the basis of a recovery, it must be fully and satisfactorily proved."

The circumstances and evidence in that case are not similar to the facts of this case and no benefit would be derived in reciting them. As for the rule there stated, we find it complied with here in that we find the contract sued upon, and its acceptance and performance by appellee, to have been "fully and satisfactorily proved."

■ Appellants also contend that the contract sued on is lacking in consideration, or that the consideration therefor is inadequate.

It is beyond dispute that appellee gave up his residence in Alabama, sold his property there, moved to San Angelo and went into business with his brother. If these acts were performed under and in conformity with the contract between the parties, as the jury found, then they are in law a detriment sustained by the promisee, appellee, and a consideration for the promise of C. L. Coulson. Rose v. San Antonio and Mexican Gulf Ry., 31 Tex. 49.

The adequacy of this consideration, under the circumstances shown by this record, is fully sustained. To give up home and country for a new life in a distant land is a very serious undertaking.

■ Appellants' third point is that the Court erred in refusing to quash the deposition of T. M. Holloway on the ground that the answer of the witness to Interrogatory No. 70 was evasive. This question and answer follow:

" 'Please detail which of these answers you have given from your personal knowledge and which answers you have given based upon information furnished you by persons other than Charles Louis Coulson.'

to which the witness answered:

" 'All interrogatories have been answered from personal knowledge from my mother, first, through the letter; secondly, through talking with my sister and Jim Coulson; thirdly, from talking with Charles Coulson; and fourthly, from what I know myself.' "

When the witness was asked this question he had then been asked and answered about 232 questions.

It would have required super intelligence to have accurately answered this question.

The answer given may not have been entirely satisfactory to appellants, and they were entitled to the use of the answer as they saw fit.

This answer, however, does not stand alone. It was augmented by the following testimony, also elicited by appellants:

"85 Q. Have you stated anything in this deposition that you do not know of your own personal knowledge? If so, which answers were not within your own personal knowledge? A. Nothing except the names of the sister of Jim Coulson and C. L. Coulson.

\*     \*     \*     \*     \*     \*

"87 Q. Realizing that you are under oath to tell the truth, and that God watches what men do, do you now say that all of your answers to this deposition are true; that none were prompted by anyone; and that you personally heard and saw everything you have testified about? A. Yes."

We believe the Trial Court was well within his discretionary authority in refusing to suppress the entire deposition of T. M. Holloway on the ground asserted.

Rule 215a, Texas Rules of Civil Procedure, provides a specific remedy for the refusal of a witness to answer interrogatories. Appellants did not avail themselves of this remedy.

We overrule Point Three.

Points Four, Five and Six are jointly presented. They are that "The Court erred in admitting hearsay evidence of the witness Holloway," and in admitting his testimony which "was not responsive to the questions asked," and in admitting his testimony consisting of "conclusions only."

The specific matters presented under these points were duly and timely presented by a motion to strike, all requests being denied by the Court. For our opinion to reflect our holdings, it is necessary to set out each question and answer admitted over objections.

█ To the inquiry[2] as to whether the letter in suit was dated and, if so, its date, the witness answered: "I do not recall the exact date of the letter, but it came to James and Ollie in the fall of 1919." The objection was that this was not responsive, hearsay and a conclusion.

We overrule these objections since the witness had seen the letter and its stamp and cancellation. The conclusion, if such it be, was a proper and reasonable one for the witness to draw.

█ The witness was asked, "Who signed the letter?" The answer was "The letter was signed in the handwriting of Charlie Coulson, which said handwriting was known to me at the time." The objection was that the answer was not responsive, and no predicate was laid as to the identity of the handwriting.

If the letter was signed in the handwriting of Charlie Coulson, it was signed by Charlie Coulson and this much of the answer was responsive. If it was signed in the hand-

writing of Charlie Coulson, then the witness must have known his handwriting, making the latter phrase harmless repetition. Also, elsewhere the witness testified in detail to his familiarity to the handwriting of Charlie Coulson.

The witness was asked why he remembered the contents of the letter. He answered: "There were several things to cause me to remember the letter. The first proposition is that I thought it was a kind proposition for my sister and her husband, Jim."

The objection was that it was an opinion, conclusion, prejudicial, and was irrelevant.

It was a conclusion, but was one which the witness alone could draw. It was not irrelevant, and if it was prejudicial it was properly so.

The witness was asked whether he had seen the letter and envelope since his mother had showed it to him. He answered:

"Yes, I have seen the letter several times since my mother first showed it to me; in fact, it was with her possessions and from the date I first saw it I continued to see it until approximately 1940, but I have not seen it since."

The objection was that all of the answer except "Yes" was unresponsive and prejudicial.

The witness was entitled to explain and amplify his answer. If the answer was prejudicial, it was properly so.

The next objection to the interrogatory is merely that the answer was immaterial. This is an insufficient objection.

The witness was asked to state in detail "What you said and what Charles Louis Coulson said about * * * (Mr. Coulson) * * * writing to * * * (appellee) * * * about coming to San Angelo."

2. The following questions were on direct examination of the witness.

**548**

The witness answered:

"I recall Mr. Charles Coulson's asking me if I knew the facts and conditions under which Jim Coulson and his wife came to Texas. I told him I did due to the fact I had seen the letter he had written and his generous offer to Mr. & Mrs. Jim Coulson coming out there. He then stated to me that he had given Jim and Ollie half of everything he owned at the time they came there and that at his death they were to get full and complete title and possession to the other half interest in his property."

The objection was that the testimony was repetitious, cumulative and that the last sentence of the answer was not responsive.

The admission of cumulative evidence and permitting repetition is largely discretionary with the Trial Court. No abuse of discretion is here charged, and none is found.

The nonresponsive objection is sound, but not cause for reversal since this testimony was cumulative of other testimony received from this and other witnesses.

The witness was asked "Please state whether or not Charles Louis Coulson ever made any statements to you as to why his brother * * * came to Texas." He answered "Yes, he was the cause of their coming there and he expected to see that they did well during his lifetime and at his death, they would take his entire property." The objection was that the question was repetitious and the answer was not responsive.

■ We agree, but both question and answer were repetition. A nonresponsive but repetitious answer is not reversible error absent abuse of discretion which is not charged.

The witness was asked, "Please state whether or not Charles Louis Coulson ever made any statement or statements to you with reference to James Green Lawson Coulson selling and sacrificing his property in order to come to Texas." He answered "No, he did not make a statement about too great a sacrifice; he just stated he was the cause of Jim selling his property in Alabama and moving to Texas, and he told me the reason why, and that was that he was to have half interest in his business, there, which he had already given him, and at his death to take all the property if he owned any at the time of his death." The objection was that after the words "too great a sacrifice" was not responsive.

The answer was certainly responsive to the question as to statements made by C. L. Coulson "with reference" to appellee "selling * * * his property in order to come to Texas." He, C. L. Coulson, stated that he caused appellee to sell his property, and he stated the nature of the cause. The objection was properly overruled.

The witness was asked [3] "When did you first learn that Charles L. Coulson did not leave his property to James Green Lawson Coulson? Please state from whom and how you received that information." He answered "I thought for several years after his death he left everything to Jim, judging from what he told me, and I first learned there was some question about it approximately two years ago. I got this information from a gentleman by the name of Smith."

Objection was made that the first part of the answer beginning with "I thought" and continuing to "he told me and" was not responsive to the question, expressed an opinion of the witness.

The objection that the witness expressed an opinion was properly overruled since the opinion of the witness was based upon other evidence in the record. We also think the answer was responsive since the witness was merely attempting to fix the date inquired about. In any event, the answer if erroneous, was extremely harmless under Rule 434, T.R.C.P.

3. The following questions were asked on cross examination of the witness.

The witness was asked "What business was James Green Lawson Coulson engaged in at the various times you were in San Angelo, Texas? Please give in detail the dates and specific business." He answered "He and his brother were operating a wholesale candy company; in 1951 when I was there he was principally retired and was collecting rents on real estate he owned there at that time."

Objection was made that the words "and his brother," were not responsive to the question and was a conclusion, and that the phrase "he owned at the time" was a conclusion, opinion and assumed ownership not established and was hearsay, and prejudicial.

Testimony that appellee was in business with his brother was certainly within the scope of the question. The real estate from which appellee was collecting rents and which he was stated to own not being identified, the offhand statement of the witness was not prejudicial and its admission, if error, is harmless under Rule 434, T.R.C.P.

The witness was asked "When were you first notified that you should search for the letter, or remember its contents?" The answer "I was first cautioned to remember its contents by my mother the first time she showed me the letter, and it was stated to me that I as a brother of Ollie, should know the contents and remember them. I was first notified to search for the letter approximately two years ago on or about October 1, of this year."

Objection was made to the first sentence ending with "remember them" because that part was hearsay, and not responsive.

We overrule this objection because part, at least, of the first sentence was admissible since it was invited by appellants and was within the legitimate scope of the question, such part being from the beginning of the sentence to the first comma. Specific objection should have been made to the remainder of the sentence in order for the objection to be reviewable.

The witness was asked "You know, of course, do you not, that H. H. Coulson supported himself until his death?" The answer was, "No I do not, for I personally know my sister and her husband Jim supported him and even helped him obtain enough money to buy a small stock of goods for his little store."

Objection was made to all the answer except "No I do not," because it was not responsive to the question and was a conclusion and hearsay.

The witness was 9 years old when H. H. Coulson died in 1911, having been born in 1902.

H. H. Coulson was the father of the Coulson brothers.

We do not know, as a matter of law, that a nine year old boy could not understand and know matters about which the witness testified. The record does not show how he obtained this information. We cannot say that it was learned from hearsay; nor can we say that the testimony was an unwarranted conclusion. It was responsive.

The witness was asked "(a) Describe in every detail every act by James Coulson in taking care of his father, giving dates that same occurred and the names of persons present with you and James Coulson when it occurred." He answered, "I know that H. H. Coulson lived in the home of Jim Coulson and my sister. I have been there and I have observed the way he was treated, and I know he was well taken care of, and I know he did not work until the last year of his death when he established a little store."

Objection was made that the answer was not responsive to the question.

The answer was responsive, although incomplete. The objection was not tenable.

The witness was asked "(b) How much of James Coulson's personal money did you ever see him spend in taking care of his father? Please give amounts, dates and

purposes for which said sums were expended." His answer was, "Back at that time there was very little personal money in our country. All I know about it, he furnished a house, food, clothing."

Objection was made that the answer was not responsive, was a conclusion and hearsay.

We consider the answer responsive, perhaps not complete, not patently hearsay, and if a conclusion, a proper one for the witness to draw.

The witness was asked "Did C. L. Coulson ever tell you he was providing for James Green Lawson Coulson's support so long as he lives?" The answer "He did not tell me he was providing his support; he told me he was giving him a half interest in his business, then at his death the balance of his property."

Objection was made that that part of the answer beginning with "he told me" and ending with "his property" was not responsive to the question asked.

■ This objection should have been sustained, but since the testimony volunteered was merely a restatement of what he and other witnesses testified to, it was harmless error under Rule 434, T.R.C.P.

The witness was asked if he compared the letter in suit with any other specimen of C. L. Coulson's handwriting at the time he read the letter. He answered, "I have seen so many of C. L. Coulson's handwritings I knew it was his even before I saw his name signed to the letter."

Objection was made that the answer was not responsive.

This objection should have been sustained. That it was overruled is harmless error under Rule 434, T.R.C.P.

The penalty prescribed by Rule 214, T.R.C.P., is the exclusion of nonpertinent testimony contained in a deposition. The failure to exclude this answer did not materially affect this trial. The witness testified fully to his acquaintance with the signature of C. L. Coulson and to the authenticity of the letter in suit.

The witness was asked with reference to appellee, James Coulson, "How long did he live with his father after marrying your sister, Ollie? Give dates and place." He answered "He did not live with his father; his father lived with him and my sister Ollie."

The answer was partially responsive, and the objection to the whole answer was inadequate.

The witness was asked concerning appellee "What property in Alabama or elsewhere did he sell after coming to Texas?" He answered "He sold his property in Alabama before going to Texas."

Objection was made that the answer was not responsive.

We believe the answer responsive and properly explicative so as to make an intelligent answer.

The witness was asked concerning appellee "State in detail the kind of business he was engaged in in Alabama in the fall of 1919, and state where the business was located, its name, the specific assets of the business and the amount of money of his own invested in the business." He answered "I do not know how much money of his own invested in his lumber business, but he had a prosperous and growing business near Sylvania, and he owned some real estate near Sylvania, Alabama. I would judge all was worth between eight and twelve thousand dollars at that time, which would be worth at the present time from fifty to seventy five thousand dollars."

Objection was made that all of the answer after the words "lumber business" was not responsive to the question, was hearsay, and particularly the last part relative to present value was wholly opinion and conclusion.

The answer of the witness was a fair answer to a very onerous question and was subject to none of the objections made.

The points under consideration are overruled.

Point Seven complains of the following jury argument made by counsel for the impleaded parties:

"In conclusion I want to say this, Mr. Luther Lynn, he's Guardian of that old gentleman. He may not know what you do here today; he may never know what result your verdict is. I say to Luther and these fine ladies I represent my set-up, we don't want anything out of this suit. I am not asking you to give these ladies a penny. I am here to tell you in their behalf that what James Louis Coulson says in his petition is true, and that's all we want. We are not trying to gobble up the estate. I tell you that in behalf of these ladies I represent. We don't want a thing; we just want the truth to come out. I say to them and Luther, if a man can understand you, you tell him if today this will—"

An objection that this argument was prejudicial was sustained. Counsel thereupon continued his argument as follows:

"I say to you ladies and gentlemen in behalf of my client, these ladies, I feel like we have had a fair trial. I know you are going to do what your conscience tells you to do based upon what you heard from the witness stand and not what I say."

No objection to this argument was made.

It is our opinion that reversible error under Rule 434, T.R.C.P. is not shown under this point.

These parties had adopted the pleadings of appellee and their pleadings, as well as all pleadings, were before the jury. While none of these parties testified, their attitude in the case was known to the jury. It was, no doubt, improper for counsel to make compurgators of himself and his clients, but the Court's action followed by the very gracious statement of counsel effaced any measure of harm which may have been occasioned.

Point eight is that the Court erred in excluding from evidence a letter written by appellants' counsel to counsel for appellee requesting information as to the name of the official to whom the Holloway deposition commission was being sent for execution and the approximate time when the deposition was to be taken, the letter also indicating the desire of counsel to be present at such time.

The deposition, on written and direct and cross interrogatories was taken without this information being furnished to counsel for appellants.

Appellants cite no rule or authority supporting the admission of this communication, nor do we know of any such rule or authority. Appellants do say that the letter bears on the "fairness" of the taking of the deposition. We believe that the "fairness" in taking this deposition is conclusively established by the certificate of the notary public, Edna Lovelady, Notary Public in and for Jackson County, Alabama, who executed the commission to take such deposition, in the absence of pleading and proof attacking such certificate. The letter was properly excluded.[4]

The Ninth point is that the Court erred in assessing all costs including the fee of the guardian ad litem for representing the minor defendants, Charles and Louis Clark, sons of Andrew Perry Clark, against the same Andrew Perry Clark.

One of counsel for appellants was the guardian ad litem.

Appellants say that the impleaded defendants, heirs of C. L. Coulson, should have been held for costs. These parties,

---

**4.** No attempt was made by appellants to invoke any of the provisions of Rule 186b, T.R.C.P.

by their pleadings, aligned themselves with appellee. They were entitled to recover their costs under Rule 131, T.R.C.P., providing that the successful party should recover costs from his adversary.

Three persons originally sued were dropped as parties. The costs attending them should have been borne by appellee. We are not advised of the amount of these costs and can make no order respecting them. If they are nominal, we will not consider them.

A fee of $500.00 was allowed the guardian ad litem. There is no evidence that the minors represented by the guardian ad litem own any property.

Appellants, citing Bruni v. Vidaurri, 140 Tex. 138, 166 S.W.2d 81, 96, assert that this cost should be taxed against appellee, whereas appellee contends that under Rule 141, T.R.C.P., the Court properly exercised his discretion in assessing this cost against Mr. Clark.

The court in Bruni does say that when an unsuccessful minor defendant has no property out of which such fee can be collected that "the .court should charge it against the successful plaintiff" as they are "deemed costs incurred by the plaintiff within the meaning of the statute." Art. 2052, R.C.S., 1925, now Rule 127, T.R.C.P.

The Court in such opinion also states:

"When there is another defendant or other defendants than the minor or the party cited by publication, no part of the fee should be taxed against the other defendant or defendants unless facts or circumstances are shown by the record from which it clearly appears that he or they should, in fairness, be required to pay part or all of the fee."

Rule 127 (Art. 2052) does not purport to adjudge costs. It merely makes each party liable for the costs incurred by him.

We believe that it was fair to all parties, including the guardian ad litem, that this fee be adjudged against the father of the minors rather than against the minors personally. We affirm the exercise of discretion by the Trial Court in this regard under Rule 141, T.R.C.P.

Point Ten is that the Court erred in admitting in evidence a letter sent by appellant, Andrew Perry Clark, as Executor under the will of C. L. Coulson, to tenants of the Coulson estate properties to pay to him all rentals for property occupied by such tenants. One of these letters was addressed to appellee.

The objection was that the letter was immaterial and irrelevant. We are inclined to agree, but, as previously held, this is not an adequate objection. It was properly overruled.

Point Eleven is that the Court erred in submitting Special Issue No. 1 over their objection that there was no pleading to support that portion of the issue reading "or to the said James Coulson and wife Ollie Coulson." [5]

Appellants state that there is evidence only that the letter in suit was written to and that the promise therein was made to James Coulson and his wife and not to James Coulson alone.

This point has given us considerable concern, and we are not free from doubt in determining it.

Since appellee was C. L. Coulson's only brother and was unquestionably the main figure in Mr. Coulson's plan, and since appellee's wife died shortly after moving to San Angelo, intestate and without children, appellee, apparently with practicalities more in mind than the fullness of his pleading, gave scant attention to the deceased Mrs. Coulson in his petition. He did plead the facts concerning her death, above recited, and further that "any interest she might have had in said contract constituted com-

---

5. The full issue has been set out in footnote 1 and will not be repeated here.

munity property of said marriage and, accordingly, at her death, passed to plaintiff under the laws of descent and distribution of the State of Texas."

Under these circumstances, we are inclined to the view that the phrase in parentheses in this issue was surplusage and that its inclusion was not harmful to appellants under Rule 434, T.R.C.P. The fact that this phrase was set off by parentheses indicates the collateral nature of it.

Mrs. Coulson was not the real party at interest in the contract. She was a formal party only. The benefits she was to have received under it were through her husband. C. L. Coulson gave no intimation that the terms of the contract had changed or that the contract had lapsed by the death of Mrs. Coulson. His statements show that he construed and interpreted the contract after the death of Mrs. Coulson as being wholly for the benefit of his brother.

We believe this holding, in principle, is supported by the decisions in Southern Underwriters v. Mowery, 147 S.W.2d 834, Texarkana Court of Civil Appeals, writ dismissed, and Beaumont City Lines v. Williams, 221 S.W.2d 560, Beaumont Court of Civil Appeals, writ ref., N.R.E. These cases are to the effect, respectively, that the entire record should be considered in preparation of an issue, and that minor departures in framing an issue are not fatal.

■ The Twelfth point is that the Court erred in permitting Honorable B. W. Smith, of counsel for appellee, to testify regarding his search for the 1919 letter including this statement, "The inquiry I made and what I learned, the probability of where it was * * * I inquired of James Coulson." He further testified that he was unable to locate the letter.

The objection to this testimony was that it was hearsay, and also a violation of Art. 3716, V.A.C.S., regulating the admission of evidence of transactions with a decedent.

It was incumbent upon appellee to prove that a diligent search had been made for the 1919 letter before secondary proof as to its contents was admissible. Smith v. Cavitt, 20 Tex.Civ.App. 558, 50 S.W. 167, Dallas Civil Appeals. See also Waggoner v. Alvord, 81 Tex. 365, 16 S.W. 1083.

The search certainly would have been less than diligent if inquiry had not been made of the addressee of the letter.

No authorities are cited to support the contention that this testimony violated Art. 3716. Mr. Smith was not a party. James Coulson was not, and is not, a decedent. The statute is inapplicable.

Nor do we find any hearsay evidence present. No statement of Mr. Coulson was repeated by the witness Smith.

The point is overruled.

■ Points Thirteen and Fourteen are jointly briefed. They are that the Court erred in submitting Special Issue No. 2 for the reason that there was no evidence and "insufficient evidence of probative force to support the issue."

Special Issue No. 2 inquired if James Coulson received the 1919 letter from C. L. Coulson. The answer was "Yes".

There is an abundance of circumstantial evidence to support the answer to this issue, much of which has been referred to above.

The letter was properly addressed and stamped and cancelled. It was in the possession of appellee's wife's mother who lived with appellee at the time the letter should have been received. Compliance with the terms of the letter by appellee is evidence that he knew the contents of the letter, and hence that he had received it.

Considering all the evidence, we are of the opinion that these points are not well taken, and they are overruled.

■ Point Fifteen is that the letter made the basis of this suit is too uncertain and ambiguous to constitute a valid contract to make a will, and is violative of the statute of frauds. (Art. 3995, V.A.C.S.).

We believe that the following rules when applied to the evidence found in this case, much of which has been referred to, are sufficient authority to sustain our action in overruling this point.

In Parks v. Caudle, 58 Tex. 216, the Court stated:

"We are also of opinion that, under the circumstances, the evidence as to the contents of the deed was not inadmissible because it was not sufficiently specific. If such a deed was in fact ever made and was destroyed by fire, no copy having been preserved, it would be rare indeed that witnesses, after twenty years had passed, would be able to testify definitely to more than its substance."

In Jordan v. Abney, 97 Tex. 296, 78 S.W. 486, 487:

"That a contract between two persons, upon valuable consideration, that one will, at his death, leave property to the other, is enforceable, where no statute is contravened, is held by an almost unbroken current of authority, English and American. Such contracts, when sufficiently certain, have been held valid and enforceable, in equity as well as at law, whether they provide for the payment of money, or the leaving of specific property, or of all or a moiety of that which the obligor should leave at his death. They have usually been put in the form of agreements to bequeath by will, but this has not been regarded as an essential feature; agreements to leave the property, or that the obligee should have it at the death of the obligor, being held sufficient."

The last point is that the Court erred in excluding from evidence certain bookkeeping records of C. L. Coulson.

Appellants say that since these records are authentic and tend to rebut the proof that Mr. C. L. Coulson recognized the contract of 1919, that they are admissible. The only basis for this contention is found in this excerpt from appellants' brief:

"If the records a man keeps cannot be offered in evidence, and his writings are excluded as self-serving, and his lips are sealed by death and nothing he said can be presented in Court in his behalf to challenge an oral presentation such as Appellee has made, then there is no defense to a case like this."

Under rules of long standing, self serving hearsay statements or writings are inadmissible. We apply these rules and sustain the action of the Trial Court in excluding these records.

Finding no reversible error, the judgment of the Trial Court is affirmed.

Affirmed.